**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| STEPHEN DOWE, Individually and on behalf of all others similarly situated, | **CLASS ACTION COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| QUEST GLOBAL SERVICES-NA, INC., BELCAN ENGINEERING GROUP, LLC, CYIENT, INC., AGILIS ENGINEERING, INC., PARAMETRIC SOLUTIONS, INC., and RAYTHEON TECHNOLOGIES CORPORATION, PRATT & WHITNEY DIVISION, | |
| Defendants. | **Dated: January 13, 2022** |

Plaintiff Stephen Dowe, individually and on behalf of all others similarly situated (as defined herein), on personal knowledge as to his own actions and on information and belief as to all other allegations, brings this action for damages and injunctive relief under the antitrust laws of the United States against QuEST Global Services-NA, Inc.; Belcan Engineering Group, LLC; Cyient, Inc.; Agilis Engineering, Inc.; Parametric Solutions, Inc.; and Raytheon Technologies Corporation, Pratt & Whitney Division (together "Defendants"). Plaintiff complains and alleges as follows:

### NATURE OF THE ACTION

1.      This action challenges under Section 1 of the Sherman Act a no-solicitation and no-hiring agreement, combination, or conspiracy between and among Defendants, pursuant to which Defendants agreed not to hire each other's engineers and other highly skilled workers.

2.      Defendants are aerospace engineering firms. All Defendants employ aerospace, mechanical, and civil engineers and other highly skilled workers, such as, but not limited to,

engineering technicians, instrumentation technicians, quality technicians, machinists, welders, and mechanics (collectively, "Skilled Aerospace Workers").

3.        Employers at times enter into "no-poach" agreements with their competitors in order to reduce the cost of labor and decrease employee mobility. These no-poach agreements can prevent companies from hiring each other's employees and diminish competitive labor markets that would otherwise lead to better product safety and quality, and also lead to better service and lower prices. Antitrust enforcement authorities have increasingly recognized these agreements as *per se* violations of the antitrust laws. The Antitrust Division of the Department of Justice has stated that no-poach agreements rob "employees of labor market competition" and they "deprive them of job opportunities, information, and the ability to use competing offers to negotiate better terms of employment".[1]

4.        This case involves such an unlawful agreement. It stems from an investigation into the labor market for aerospace workers by the Defense Criminal Investigative Service (DCIS) of the United States Department of Defense. The DCIS filed an Affidavit in Support of Criminal Complaint and Arrest Warrant on December 6, 2021. *See* Aff. in Supp. of Criminal Compl. and Arrest Warrant, *United States v. Patel*, No. 3:21-mj-1189, ECF No. 15 (D. Conn. Dec. 9, 2021) ("Mehring Affidavit"). The Mehring Affidavit described a no-poach agreement among the Defendants that had been concealed by them until the DCIS filing. In addition, six executives from Defendants have been indicted for participation in the alleged no-poach agreement. *See* Indictment, *United States v. Patel, et al.*, No. 3:21-cr-00220, ECF No. 20 (D. Conn. December 15, 2021) ("Indictment").

---

[1] https://www.justice.gov/atr/division-operations/division-update-spring-2018/antitrust-division-continues-investigate-and-prosecute-no-poach-and-wage-fixing-agreements Last visited January 12, 2022.

5.      The Mehring affidavit alleges that Mahesh Patel an employee of "Company A", an aerospace company, was directly involved in the implementation and maintaining of a no-poach agreement among aerospace companies to reduce or maintain low wages. In addition to Patel, the Mehring affidavit lists aerospace companies "Company A", "Company B", "Company C", "Company D", "Company E", and "Company F" all as co-conspirators.

6.      On information and belief, Plaintiffs allege that "Company A" is Pratt & Whitney, "Company B" is QuEST Global Services-NA, Inc., "Company C" is Belcan Engineering Group, LLC, "Company D" is Cyient, Inc., "Company E" is Parametric Solutions, Inc., and "Company F" is Agilis Management, Inc. The conspiracy is alleged to have started in 2011 and lasted at least until 2019.

7.      The no-poach agreements accomplished their purpose. They reduced competition for Defendants' aerospace workers and suppressed employee compensation below competitive levels. Defendants disrupted the labor market and colluded against their current and former employees in order not to compete for labor.

8.      The no-poach agreements between Defendants were unlawful and not necessary to accomplish any legitimate business transaction.

9.      Defendants' actions denied aerospace workers opportunities, restricted mobility and wages, and deprived the workers of information they could have used to negotiate better compensation.

## JURISDICTION AND VENUE

10.      Plaintiff brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, to recover damages and obtain injunctive relief, including treble damages, costs of suit, and

reasonable attorneys' fees for the injuries that Plaintiff and members of the Class sustained as a result of Defendants' violations.

11.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 15 U.S.C. §§ 15 and 26.

12.     This Court has personal jurisdiction over Defendants because, among other things, they (a) transacted business throughout the United States, including in this District; (b) had and maintained substantial aggregate contacts with the United States as a whole, including in this District; (c) had substantial contact in various states in the United States, including in this District; and (d) were engaged in an illegal conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

13.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because during the Class Period, Defendants resided or transacted business in this District, and a substantial portion of the affected interstate trade and commerce was carried out in this district.

## PARTIES

14.     Plaintiff Stephen Dowe is a resident of Barrington, New Hampshire. He was employed as a tooling analyst for Cyient, Inc. from 2012 until 2021, working on Pratt & Whitney projects. Mr. Dowe was injured in his business and property by reason of the No Poach Agreement alleged herein.

15.     Defendant Raytheon Technologies Corporation, Pratt & Whitney Division ("Pratt & Whitney") is a company organized and existing under the laws of Delaware with its principal place of business in East Hartford, Connecticut is a subsidiary of Raytheon Technologies Corporation. During the relevant period, Pratt & Whitney participated in the conspiracy and, through its executives, managers, employees, or agents, committed overt acts in furtherance thereof.

16.     QuEST Global Services-NA, Inc. ("QuEST") is an Ohio corporation with a principal place of business in East Hartford, Connecticut. QuEST supplies Engineers who worked on projects for Pratt & Whitney and other aerospace firms on an outsource basis. QuEST competes with Pratt & Whitney as well as the other Defendants to recruit and hire Engineers. QuEST also competes with other Defendants for outsource work from Pratt & Whitney and does so on the basis of, among other things, price. QuEST executives Robert Harvey and Harpreet Wasan were indicted for their participation in the alleged no-poach agreement.

17.     Defendant Belcan Engineering Group, LLC ("Belcan") is an Ohio corporation with a principal place of business in Windsor, Connecticut. Belcan supplies Engineers who work on projects for Pratt & Whitney on an outsource basis. Belcan competes with Pratt & Whitney as well as the other Defendants to recruit and hire engineers. Belcan also competes with other Defendants for outsource work from Pratt & Whitney and does so on the basis of, among other things, price. Belcan executive Steve Houghtaling was indicted for his participation in the alleged no-poach agreement.

18.     Defendant Cyient, Inc. ("Cyient"), formerly known as Infotech Enterprises Limited, is a California corporation with a principal place of business in East Hartford, Connecticut. Cyient supplies Engineers who worked on projects for Pratt & Whitney on an

outsource basis. Cyient competes with Pratt & Whitney as well as the other Defendants to recruit and hire Engineers. Cyient also competes with other Defendants for outsource work from Pratt & Whitney and does so on the basis of, among other things, price. Cyient executive Tom Edwards was indicted for his participation in the alleged no-poach agreement.

19.     Defendant Parametric Solutions, Inc. ("PSI") is a Florida corporation with offices in Jupiter, Florida. PSI supplies Engineers who worked on projects for Pratt & Whitney on an outsource basis. PSI competes with Pratt & Whitney as well as the other Defendants to recruit and hire Engineers. PSI also competes with other Defendants for outsource work from Pratt & Whitney and does so on the basis of, among other things, price. PSI executive Gary Prus was indicted for his participation in the alleged no-poach agreement.

20.     Defendant Agilis Engineering, Inc. ("Agilis") is a Florida corporation with a principal place of business in Palm Beach Gardens, Florida. Agilis supplies employees who worked on projects for Pratt & Whitney on an outsource basis. Agilis competes with Pratt & Whitney as well as the other Defendants to recruit and hire engineers. Agilis also competes with other Defendants for outsource work from Pratt & Whitney and does so on the basis of, among other things, price.

## FACTUAL ALLEGATIONS

### The Conspiracy

21.     Beginning at least as early as 2011, Pratt & Whitney orchestrated a no-poach agreement to prevent the free movement of Skilled Aerospace Workers among Defendants.

22.     Pratt & Whitney served as a leader and primary enforcer of the no-poach agreement and did so through Mahesh Patel – a manager and later the director of the unit within Pratt & Whitney in charge of managing relationships with Defendants.

23.     Pratt & Whitney employed Skilled Aerospace Workers and also entered into Outsource Aerospace Engineering Projects with the Defendants. If labor costs increased due to increased wages or benefits to Skilled Aerospace Workers, Pratt & Whitney felt those effects not only in its own labor costs, but in the Defendants' labor costs that were passed on to Pratt & Whitney through Outsource Aerospace Engineering Project contracts.

24.     In order to reduce costs and limit compensation and mobility for Skilled Aerospace Workers, Defendants joined the conspiracy. In furtherance of the conspiracy, Defendants, entered into no-poach agreements to eliminate competition between and among themselves for Skilled Aerospace Workers.

25.     The no-poach agreement manifested itself in interwoven and overlapping hiring and recruiting restrictions, all of which had the common purpose of limiting competition for, and thereby restricting the free movement of, Skilled Aerospace Workers within the industry. The no-poach Agreement thus artificially extended Skilled Aerospace Workers' length of work at a given employer and reduced or eliminated their ability to advocate and obtain better terms of employment, including compensation, at current and future employers.

**Competition for Skilled Aerospace Workers**

26.     Defendants are top participants in the aerospace industry. There are currently 69,600 aerospace engineers in the United States, its territories, and the District of Columbia and tens of thousands of additional Skilled Aerospace Workers including, without limitation, mechanical and civil engineers, engineering technicians, instrumentation technicians, quality technicians, machinists, welders, and mechanics.

27.     Prior to the conspiracy periods, Defendants competed with each other to hire and retain Skilled Aerospace Workers throughout the United States.

28.     In a properly functioning and lawfully competitive labor market, and but for the unlawful no-poach agreement, Defendants would continue to aggressively compete for Skilled Aerospace Workers by recruiting and hiring from each other.

29.     Absent the agreements, Defendants would both actively recruit Skilled Aerospace Workers and also receive direct applications from such qualified individuals. Direct solicitation of lateral employees is a highly efficient and effective way to compete for qualified employees.

30.     A competitive labor market is one where there are many potential employers for a given type of worker. Competition for highly skilled talent in the aerospace industry benefits employees because it increases the available job opportunities and improves the employee's ability to negotiate for a better salary and other terms of employment. Absent collusion, Defendants previously had been able to take advantage of the efforts their fellow aerospace companies took in identifying and training their employees. Without the option of poaching lateral talent, the hiring firm must invest significant resources in identifying, assessing, and training new employees.

31.     The threat of losing employees to competitors encourages employers to preemptively increase compensation to increase morale, productivity, and retention. If employers do not react to competition, their employees may seek positions that offer more generous compensation and benefits elsewhere, be receptive to recruiting by a rival employer, or reduce their productivity and morale.

32.     Once an employee has received an offer from a rival, retaining the employee may require a disruptive increase in compensation for one individual, if retention is possible at all, and cascading (and unplanned) pressures on compensation of other employees where internal equity and fair pay analysis would demand similar raises. Employers therefore have an incentive to preempt lateral departures by paying all employees well enough that they are unlikely to seek or

pursue outside opportunities. Preemptive retention measures thus lead to increased compensation for all employees.

33.     The availability of desirable positions at competing employers also forces employers to reactively increase compensation to retain employees who are likely to join a competitor. This can occur both when a particular employee or group of employees becomes interested in switching employers and the current employer responds by offering a compensation increase to retain them, or when an employer responds to overall attrition rates among its employees by increasing compensation levels. In the former case, even a targeted increase designed to retain specific employees may put upward pressure on the entire compensation structure. Just as competition forces employers to preemptively or reactively raise compensation to retain employees who might otherwise seek employment elsewhere, it also encourages increased compensation for related workers. Thus, increased movement of one category of employee not only increases the compensation for those employees, but also for the categories of employees who are likely to also seek parallel lateral positions, with similar higher compensation and benefits.

34.     Just as competition forces employers to preemptively or reactively raise compensation to retain employees who might otherwise seek employment elsewhere, it also encourages increased compensation for related workers. Thus, increased movement of one category of employee not only increases the compensation for those employees, but also for the categories of employees who are likely to also seek parallel lateral positions, with similar higher compensation and benefits.

35.     Defendants' no-poach agreement precluded this information from reaching Skilled Aerospace Workers at Defendants' companies. Those employees would have used that information to negotiate higher pay at their existing jobs, or to accept superior offers from their

employers' competitors. Employees who change jobs voluntarily typically have faster wage growth than those who remain in the same job. The Skilled Aerospace Workers could have also shared this information with their co-workers, multiplying the impact of each offer as the information would have spread through social channels.

36.     Defendants' conspiracy restrained competition for Skilled Aerospace Workers and disrupted the normal bargaining and price-setting mechanisms that apply in competitive labor markets. This disruption and suppression of compensation was not limited to particular individuals who would otherwise have been solicited or sought to change employers. The effects of eliminating solicitation and lateral hiring, pursuant to agreement, caused widespread impact on Defendants' Skilled Aerospace Workers by eliminating or reducing the flow of information and the need for preventive and reactive increases to compensation for the entire Class.

### Restricting Hiring and Recruiting Among Suppliers

37.     Beginning in 2011, Defendants who provided Skilled Aerospace Workers to Pratt & Whitney entered into agreements to restrict the hiring and recruiting of Skilled Aerospace Workers between them.

38.     Defendants through their officers, directors, agents, employees, or representatives agreed not to hire or recruit one another's Skilled Aerospace Workers.

39.     Pratt & Whitney's role in this conspiracy began in 2011, with Patel taking an active leadership role in the conspiracy.

40.     According to the Mehring Affidavit, "PATEL explicitly told Supplier managers and executives that [Pratt & Whitney]'s Suppliers should not be recruiting and hiring each other's employees. The Suppliers, in turn, understood that these restrictions applied mutually among the Suppliers themselves." Mehring Affidavit ¶16.

41.     Pratt & Whitney, through Patel, continuously reminded Defendants about the no-poach restrictions and took septs to make sure the agreements were enforced. "At times, when infractions of the agreement occurred, a Supplier alerted PATEL to the violation and requested that he assist in preventing or deterring such conduct. PATEL often responded to these requests by reprimanding the noncompliant Supplier." Mehring Affidavit, ¶26.

42.     In or around December 2015, a dinner was attended by representatives of QuEST, Belcan, and Cyient, as well as alleged Co-Conspirators Patel, Wasan, and Edwards. An executive at QuEST sent an email to Houghtaling summarizing the dinner and stated that "Mahesh did take the stage at the end. . . no poaching of each others' [sic] employees."

43.     In or around November 2016, Belcan attempted to actively recruit from Parametric, prompting Patel to send a message to Houghtaling stating, "[w]e must not poach each other [sic] partners [sic] employee [sic]. Please communicate to [Belcan] HR not to interview or hire active employees working on [Pratt and Whitney] work."

44.     In January 2017, Patel emailed Prus, the Chief Operating Officer, Executive Vice President and part owner of PSI. He stated: "Last time we talked you assured me that you will not hire any [Pratt & Whitney] partners employee [sic]. This must stop, otherwise others will also start poaching your employees." Mehring Affidavit ¶ 29.

45.     In a January 2017 email, after learning that Parametric had poached an employee of Cyient, Patel contacted a representative of Parametric to say "[p]lease do not hire any partners [sic] employee, whether they approached or you approached [them]."

46.     When the representatives took their grievances to Patel, he was able to enforce the agreement and ensure that no poaching occurred. For example, when Belcan informed Patel that Parametric was attempting to poach Belcan's employees, Patel wrote to Prus stating "You had

assured me that [Parametric] will never soliciting [sic] [Pratt and Whitney's] long term partners [sic] employees. . . . Please send me in writing that proper steps has [sic] taken place to curtail this practice." Prus then gave instructions to a Parametric employee to "[p]lease stop speaking to any [Belcan] or other [Pratt and Whitney] supplier companies about transitioning to a [Parametric] Office immediately" to which another Parametric employee responded, "[c]onsider it done."

47.     In February 2015, "after [Cyient] hired an employee of [QuEST], Edwards emailed another executive of [Cyient], stating 'I let Mahesh know that this happened - [a]nd we are still looking into how exactly this happened.' Edwards asks the executive 'can you let Mahesh know the actions we're taking to prevent this from happening again?'" Indictment, ¶25(c).

48.     "[I]n May 2016, a [Belcan] Vice President was informed by a colleague that '[a]nother employee' had been hired by [PSI] to work on outsourcing a project for a non-[Pratt & Whitney] company. The colleague asked [the Belcan Vice President] if he 'ever discuss[ed] the last one with Mahesh.' [The Belcan Vice President] assured the colleague that he had spoken to PATEL and that PATEL said he'd talk to [PSI] about it. [The Belcan Vice President] subsequently emailed Patel to complain that his company was 'losing another employee to [PSI],' and named the employee." Mehring Affidavit, ¶27.

49.     "In November 2016, [an executive of PSI] wrote an email to PATEL complaining about '[Belcan] actively Recruiting [PSI] employees.' PATEL forwarded [the executive of PSI]'s email to [executives of Belcan] and another [Belcan] manager, saying, '[w]e must not poach each other partners employee. Please communicate to [Belcan] HR not to interview or hire active employees working on [Pratt & Whitney] work.'" *Id.*

50.     In or around February 2017, when Belcan made an offer to a QuEST engineer, Wasan—whose responsibilities included speaking with Patel when to enforce the No Poach

Agreement—stated that "[Belcan] is not allowed to poach any of our employees and I will plan to block this immediately. I will send this to Mahesh today." He then emailed Patel and said, "I am very concerned that [Belcan] believes they can hire any of our employees. . . . Could you please stop this person from being hired by [Belcan]?"

51.     In June 2018, Patel communicated with executives from Belcan about Belcan's recent employment offer to an engineer at QuEST. A recruiter at Belcan explained in an internal email that "'[QuEST] complained to [Pratt & Whitney] that we are "stealing" their people, and [Pratt & Whitney] threatened to pull all POs from [Belcan] if we hire him.'" *Id.*, ¶33. The next day, a Belcan employee emailed Patel, "Per our conversation yesterday, this email is to confirm that we have rescinded the offer letter for" that engineer. *Id.*

52.     In a September 2019, after Agilis had hired four Cyient employees, Edwards, the President for Cyient's North America Operations, reached out to the Founder, President, and Chief Executive Officer of Agilis, and asked him to stop "actively recruiting" Cyient's employees. Mehring Affidavit ¶ 34; Indictment ¶ 27(a). Edwards stated, "I wanted to ask if your team could refrain from actively recruiting our employees going forward," and assured the CEO of Agilis that "I flat out ask our teams not to hire people from the other [Company A] suppliers." Indictment ¶ 27(a). Agilis' CEO agreed, telling Edwards that Agilis' "general aim is NOT to recruit from the local 'competition' because no one wins; salaries rise, the workforce get unstable, and our margins all get hurt." Id. In response, Cyient's head of North America Operations thanked Agilis' CEO and noted "I flat out ask our teams not to hire people from the other [Pratt & Whitney] suppliers." Mehring Affidavit ¶ 34; Indictment ¶ 27(a).

**Restriction on Hiring and Recruiting Between Pratt & Whitney and QuEST**

53.     In furtherance of the no-poach conspiracy, Pratt & Whitney and QuEST reach a further agreement to restrict Pratt & Whitney's hiring and recruiting of Skilled Aerospace Workers from QuEST. The agreement laid out two primary limitations: 1) setting a two-year tenure restriction and 2) instituting periodic hiring freezes.

54.     In 2011, Harvey, President and Global Business Head of QuEST, worked with a colleague to institute an arrangement whereby Pratt & Whitney would not hire any of QuEST's Skilled Aerospace Workers and vice versa. At a dinner that year, Patel, another Vice President at Pratt & Whitney, and Harvey discussed a "new policy/guideline" related to a "min. 24 months" for "personnel transfers" between the two companies. Mehring Affidavit ¶42.

55.     After that, the two companies communicated about and continued to maintain and enforce this two-year tenure agreement. For example, in October 2012, it was requested that Patel not hire a QuEST engineer because the "[Employee]'s tenure at [QuEST] dates to May 2011. Based on our agreement of two-year minimum tenure, we would ask that [Pratt & Whitney] not pursue employment of [him] at this time."

56.     To further the No Poach Agreement, for certain periods between 2015 and 2017, Pratt and Whitney and QuEST also communicated about formal policies to forgo hiring one another's Skilled Aerospace Workers irrespective of any question of minimum tenure.

57.     For example, in September 2015, Patel sought concurrence from QuEST to hire two engineers from QuEST. Harvey replied and pushed back on Patel's request by stating "Mahesh, we truly need your help in blocking these two hires and putting a moratorium on [QuEST] hires for the remainder of the year."

58.     In another example, Wasan sent an email to Patel regarding a [QuEST] employee that [Pratt & Whitney] was interested in hiring, writing 'we cannot lose him' and complaining to

Patel that '[Pratt & Whitney] keeps poaching this team.' Patel then emailed a [Pratt & Whitney] hiring contact and explained: 'I checked with [QuEST] They absolutely do not want to release [the employee]. Please do not extend offer to him. [Pratt & Whitney] has committed to [QuEST] that we will not hire any more of their employees this year in 2016.' (Emphasis in original.) Patel sent the correspondence to Wasan, and Wasan thanked Patel." Indictment, ¶23(b).

59.    In April 2017, a manager wrote in an internal email that he had heard Pratt & Whitney wanted to hire a particular QuEST employee, but he "wouldn't meet our requirements for two years.'" Mehring Affidavit ¶46. Two days later, the manager emailed Patel, saying the employee "does not meet tenure requirements.'" Id. Patel then told a Pratt & Whitney Human Resources employee: "[QuEST] will not release him. … He has not completed 2 [y]ears as our verbal agreements.'" Id. (ellipsis in original).

60.    Patel made sure that Pratt and Whitney executives were aware of the hiring freeze so that they would abide by them. Patel emailed a Vice President of Human Resources at Pratt and Whitney and told her to "direct your HR team not to hire [QuEST] outsource resources currently deployed on [Pratt and Whitney] projects till end of this year. . . . [QuEST] senior leadership including CEO has repeatedly raised concerns on [Pratt and Whitney] hiring [QuEST] employees. We will lift [QuEST] hiring restriction from Jan 1, 2018."

**Plaintiff's and the Class's Antitrust Injury**

61.    Plaintiff was employed as an engineer by Cyient from 2012 until January 2021, working as a tooling analyst (including periods as Site Manager and Team Lead) at Cyient's facility in North Berwick, Maine. Plaintiff applied for positions at other Defendant companies, including Pratt & Whitney and Belcan, without success.

62.     Defendants are some of the largest aerospace companies in the United States. During the relevant period Defendants own and operated aerospace companies across the United States, including in this jurisdiction.

63.     Over a period spanning several years, Defendants entered into no-poach agreements to eliminate competition among them for Skilled Aerospace Workers. They did so to artificially depress wages and benefits and reduce worker mobility.

64.     The proximate and foreseeable results of the no-poach Agreement was to deprive Plaintiffs and the Class of higher wages, better benefits, and greater job choice and mobility.

65.     Depressed wages and employment benefits resulting from employers' agreement not to compete with each other in the labor market the type of injury antitrust laws were intended to prevent and flow from that which makes the no-poach Agreement unlawful.

66.     These agreements were executed and enforced by the companies' officers, directors, agents, employees, or representatives in the recruiting and human resources department. The no-poach agreements were not reasonably necessary to any separate, legitimate business transaction or collaboration between the companies and resulted in injury to the Plaintiff and member of the proposed Class.

67.     As a proximate result of Defendants' actions, Plaintiff was deprived of higher wages, better benefits, and greater job choice and mobility. This injury is the type of injury that the antitrust laws were intended to prevent.

**Effects on Interstate Commerce**

68.     During the relevant time period, Defendants employed members of the Proposed Class throughout the United States, including in this judicial district.

69.     The Conspiracy substantially reduced competition for labor in the aerospace industry and suppressed the efficient movement and compensation of Skilled Aerospace Workers, harming Plaintiff and members of the Proposed Class. The harm extended not only to those who did or would otherwise have sought to change companies, but also to those who had no intention of seeking other employment because the no-poach agreements enabled Defendants to maintain suppressed compensation levels generally.

70.     Thus, Defendants' no-poach agreements and related conduct substantially affected interstate commerce for employee services and caused antitrust injury throughout the United States.

### The Statute of Limitations Does Not Preclude Recovery for the Entire Class Period

71.     During the Class Period, knowledge of the agreements was closely held by officers, directors, agents, employees, or representatives of the Defendants' companies who relied on direct and non-public communications with one another to manage and enforce the no-poach agreements, including in-person discussions and private email communications. Plaintiff and members of the Proposed Class did not and could not have discovered through the exercise of reasonable diligence that Defendants were engaged in secret no-poach agreements.

72.     Plaintiff and Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were conspiring to restrain competition for the services of their Skilled Aerospace Workers until the Department of Justice made public the DCIS Affidavit in Support of Criminal Complaint and Arrest Warrant on December 9, 2021. Plaintiff was not aware of the no-poach agreements before that time.

73.     Defendants did not put their agreements in public writings so that they could avoid detection. The knowledge of the no-poach agreements was held in secret by the executives and a

small number of recruiters and Human Resources personnel so that the no-poach agreements could be maintained and executed as intended while being kept confidential. Defendants discussed, monitored, informed each other issues arising from the no-poach agreement verbally or through confidential email communication concealed from the employees and the public.

74.    Defendants' secretive maintenance and enforcement of the no-poach agreements deliberately and effectively concealed their misconduct until Department of Justice revealed it.

75.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule, the doctrine of equitable tolling, or Defendants' fraudulent concealment. Defendants are thus estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

76.    Plaintiff brings this action on behalf of himself and all others similarly situated (the "Proposed Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), as follows:

> All natural persons who worked as engineers and other skilled workers in the United States between January 1, 2011 and at least September 30, 2019 ("Class Period") for one or more of the Defendants. The term "engineers and other skilled workers" will be defined with reference to specific job titles upon Plaintiff's analysis of discovery materials. Excluded from the Class are senior corporate officers and personnel in the human resources, recruiting, and legal departments of the Defendants.

77.    Plaintiff does not yet know the exact size of the Class because such information is in the exclusive control of Defendants. Based upon publicly available information, there are thousands of Class members. Joinder of all members of the Class is therefore impracticable.

78.    The Class is precisely ascertainable from Defendants' records. Based upon these records and expert analysis, Plaintiff will determine which job titles constituted Skilled Aerospace Workers, and therefore were subject to and injured by the conspiracy among Defendants.

79.     Plaintiff's claims are typical of the claims of the Proposed Class as they arise out of the same course of Defendants' conduct and the same legal theories.

80.     Plaintiff will fairly and adequately represent the interests of the Proposed Class and has no conflict with the interests of the Proposed Class or Subclasses.

81.     Plaintiff has retained counsel competent and experienced in both antitrust and class action litigation.

82.     Numerous questions of law and fact common to each Class member exist that predominate over questions affecting only individual members, including, but not limited to:

a.      whether Defendants agreed not to solicit or hire each other's Skilled Aerospace Workers;

b.      whether such agreements were *per se* violations of the Sherman Act;

c.      whether Defendants have fraudulently concealed their misconduct;

d.      whether and the extent to which Defendants' conduct suppressed compensation below competitive levels for their Skilled Aerospace Workers;

e.      whether Plaintiff and the Class suffered antitrust injury as a result of Defendants' agreements; and

f.      the type and measure of damages suffered by Plaintiff and the Class.

g.      the nature and scope of injunctive relief necessary to restore a competitive market.

83.     During the Class Period, Plaintiff was employed as an engineer by Cyient, in particular as a tooling analyst. Plaintiff's interests are coincident with and not antagonistic to those of other members of the Class.

84.     Plaintiff is a member of the Class, has claims that are typical of the claims of the Class, and will fairly and adequately protect the interests of the Class. In addition, Plaintiff is

represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

85.     The above-referenced common questions of law and fact predominate over any questions affecting only individual members of the Class.

86.     Defendants have acted on grounds generally applicable to the proposed Class, thereby making final injunctive relief appropriate with respect to the proposed Class as a whole.

87.     A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions, the duplication of discovery, effort, expense, risk of inconsistent judgments, and the burden of the courts that individual actions would create.

## CLAIM FOR RELIEF

### (Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)

88.     Plaintiff realleges and incorporates by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

89.     Defendants, by and through their officers, directors, employees, or other representatives, entered into and engaged in unlawful agreements in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Specifically, Defendants and their co-conspirators agreed to restrict competition for Class members' labor through refraining from soliciting or hiring each other's Skilled Aerospace Workers, thereby fixing and suppressing Class members' compensation.

90.     Defendants' agreements have included concerted action and undertakings with the purpose and effect of: (a) fixing Plaintiff and the Class's compensation at artificially low levels;

and (b) eliminating, to a substantial degree, competition among Defendants and their coconspirators for employees.

91.    Defendants' combinations and conspiracy injured Plaintiff and the members of the Class by suppressing their compensation and depriving them of free and fair competition in the market for their services.

92.    Defendants' conduct and agreements are *per se* violations of Section 1 of the Sherman Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf the proposed Class of similarly situated persons, respectfully seeks the following relief:

A.  An order certifying this action as a class action under Fed. R. Civ. 23(a) and (b)(3), defining the Class as requested herein, finding that Plaintiff is a proper representative of the Class requested herein, and appointing Plaintiff's counsel as Class Counsel.

B.  The conduct alleged herein be declared, adjudged, and decreed to be *per se* unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Plaintiff and the members of the Proposed Class have been damaged and injured in their business and property as a result of Defendants' unlawful conduct;

C.  Plaintiff and the Class recover their damages, trebled, and the costs of the suit, including reasonable attorneys' fees and expenses as well as prejudgment and post judgment interest as provided by law;

D.  Injunctive relief, declaring the no-poach agreement among Defendants unlawful and enjoining Defendants from enforcing the agreement or entering into similar agreements going forward; and

E.  For such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, individually and on behalf of the proposed Class, demands a trial by jury on all issues so triable.

Dated:  January 13, 2022

By: _____

Richard E. Hayber
CT11629
**HAYBER, MCKENNA & DINSMORE, LCC**
750 Main Street, Suite 904
Hartford, CT 06103
Tel: (860) 920-5362
rhayber@hayberlawfirm.com

Derek Y. Brandt*
Leigh M. Perica*
Connor P. Lemire*
**MCCUNE WRIGHT AREVALO, LLP**
231 North Main Street, Suite 20
Edwardsville, Illinois 62025
Tel: (618) 307-6116
Fax: (618) 307-6161
dyb@mccunewright.com
lmp@mccunewright.com
cpl@mccunewright.com

Richard D. McCune*
Dana R. Vogel*
**MCCUNE WRIGHT AREVALO, LLP**
18565 Jamboree Road, Suite 550
Irvine, CA 92612
T: (909) 557-1250
rdm@mccunewright.com
drv@mccunewright.com

Attorneys for Plaintiff and the Class

* *Pro hac vice* application forthcoming

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
STEPHEN DOWE

**DEFENDANTS**
QUEST GLOBAL SERVICES-NA, INC., et al.

**(b)** County of Residence of First Listed Plaintiff   Strafford County, NH
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Hartford County, CT
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Richard E. Hayber, Hayber, McKenna & Dinsmore, LLC,
750 Main Street, Suite 904, 750 Main Street, Suite 904,

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                      *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment
    & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted
    Student Loans
    (Excludes Veterans)
☐ 153 Recovery of Overpayment
    of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product
    Liability
☐ 320 Assault, Libel &
    Slander
☐ 330 Federal Employers'
    Liability
☐ 340 Marine
☐ 345 Marine Product
    Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle
    Product Liability
☐ 360 Other Personal
    Injury
☐ 362 Personal Injury -
    Medical Malpractice

**PERSONAL INJURY**
☐ 365 Personal Injury -
    Product Liability
☐ 367 Health Care/
    Pharmaceutical
    Personal Injury
    Product Liability
☐ 368 Asbestos Personal
    Injury Product
    Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal
    Property Damage
☐ 385 Property Damage
    Product Liability

### CIVIL RIGHTS
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/
    Accommodations
☐ 445 Amer. w/Disabilities -
    Employment
☐ 446 Amer. w/Disabilities -
    Other
☐ 448 Education

### FORFEITURE/PENALTY
☐ 625 Drug Related Seizure
    of Property 21 USC 881
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards
    Act
☐ 720 Labor/Management
    Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical
    Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement
    Income Security Act

### PRISONER PETITIONS
**Habeas Corpus:**
☐ 463 Alien Detainee
☐ 510 Motions to Vacate
    Sentence
☐ 530 General
☐ 535 Death Penalty
**Other:**
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee -
    Conditions of
    Confinement

### IMMIGRATION
☐ 462 Naturalization Application
☐ 465 Other Immigration
    Actions

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal
    28 USC 157

### INTELLECTUAL PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent - Abbreviated
    New Drug Application
☐ 840 Trademark
☐ 880 Defend Trade Secrets
    Act of 2016

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff
    or Defendant)
☐ 871 IRS—Third Party
    26 USC 7609

### OTHER STATUTES
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC
    3729(a))
☐ 400 State Reapportionment
☒ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and
    Corrupt Organizations
☐ 480 Consumer Credit
    (15 USC 1681 or 1692)
☐ 485 Telephone Consumer
    Protection Act
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/
    Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information
    Act
☐ 896 Arbitration
☐ 899 Administrative Procedure
    Act/Review or Appeal of
    Agency Decision
☐ 950 Constitutionality of
    State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
Another District
*(specify)*

☐ 6 Multidistrict
Litigation -
Transfer

☐ 8 Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. 1
Brief description of cause:
Per Se Unlawful No-Hiring Agreement Among Competitors in Violation of Sherman Act

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE   Judge Nagala

DOCKET NUMBER   3:21-1657

DATE
January 13 2022

SIGNATURE OF ATTORNEY OF RECORD

### FOR OFFICE USE ONLY

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE